

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| ANDREA CHALEENE POLCYN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 6:03-2327-HFF |
| | § | |
| J.T. MARTIN, BRIAN TOLLISON, LT. JAMES BEAVER, STEVE LOFTIS, in his capacity as Greenville County Sheriff, BRYAN NICHOLSON, | § § § § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This is a civil rights action brought pursuant to 42 U.S.C. § 1983, along with related state claims. The Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 and over the state claims under 28 U.S.C. § 1367. For the reasons stated below, the Court will grant, as to the § 1983 claims, Defendants' motion for summary judgment and will dismiss the remaining claims.

## II. FACTUAL AND PROCEDURAL HISTORY[1]

In the early morning hours of February 10, 2002, Defendant J.T. Martin (Martin) was dispatched to the home of Bryan Nicholson (Nicholson) and Plaintiff Andrea Polcyn (Polcyn). Nicholson informed Martin that he had awoken during the night to find Polcyn missing from their home. According to Martin, Nicholson also stated that Polcyn had a drinking problem, that she had possibly been taking drugs, and that she had seen doctors for a bipolar disorder. Nicholson further allowed that he and Polcyn had been arrested for domestic violence in Ohio and in Greenville, South Carolina and that Polcyn had made threats to take their children, abuse them, and blame it on Nicholson. At the conclusion of this conversation, which lasted approximately forty-five minutes, Martin agreed to look for Polcyn in the vicinity of the Nicholson/Polcyn home. Martin subsequently quit the premises.

After departing, Martin drove behind a vehicle with no licence plate, a state law violation. Martin pulled the vehicle over, approached the driver's side of the vehicle, and asked the driver for his license. The driver was Artis Anthony Gibson (Gibson). In the passenger seat was a white female whose appearance and clothing fit the description of Polcyn. Martin then asked for the passenger's license, which listed her name as Andrea Chaleene Polcyn. After Martin informed Gibson that Polcyn had been reported missing by Nicholson, Gibson stated that he did not know that Polcyn was missing, that he wanted no part in dealing with Polcyn's situation, and that he wanted to leave the scene. Gibson further volunteered that he had picked Polcyn up while she was hitchhiking and that she had asked him to take her to a local bar.

---

[1] As required when analyzing a motion for summary judgment, the Court views the facts–and recites them here–in a light most favorable to the non-moving party (Polcyn).

At that point, Defendant Brian Tollison (Tollison) arrived at the scene. Tollison assisted Polcyn from the vehicle, and Martin instructed Gibson to remain at the scene. Martin smelled a strong odor of alcohol coming from Polcyn but not from Gibson, and Martin determined that Polcyn was likely intoxicated. Tollison, as well, believed Polcyn to be "grossly intoxicated." Polcyn then confirmed Gibson's report as to her previous activities, but Polcyn stated that she was unaware that Nicholson had reported her missing. Polcyn said that she did not want to go home but wanted to walk to a local bar. At this point, Martin informed Polcyn that he could not let her walk down the street in her intoxicated state. Martin later testified that he felt responsible for her because of her state of intoxication and that it has been his experience as a law enforcement officer that intoxicated persons make poor decisions. After Martin allowed Gibson to leave, Defendant James Beaver (Beaver) arrived at the scene.

Martin next asked Polcyn to sit in his car while he had the dispatcher telephone Nicholson and ask him to come and take custody of Polcyn. At this time Martin believed, and Polcyn concedes, that he had probable cause to arrest her for public drunkenness. Martin, in fact, informed Polcyn of this at the time. Nicholson later arrived, and Tollison testified that Nicholson seemed fairly calm upon his arrival. Martin told Nicholson that Polcyn was not under arrest and informed him of the circumstances in which she was found. Then, Martin gave Polcyn the choice of being arrested or going home with Nicholson. Although Polcyn did not initially respond, she eventually walked over to Nicholson's vehicle. Nicholson and Polcyn then left the scene.[2]

---

[2] Nicholson later testified that Polcyn was in an agitated state, that he suggested that she be taken to jail, and that Martin said it was better for her to return home. Nicholson also recalled that Martin had to open the vehicle door for Polcyn to board the vehicle. Martin, on the other hand, did not remember Nicholson asking that Polcyn be taken to jail instead of sent home. Polcyn, in yet another version of the events, testified that she told the officers that she did not

Shortly thereafter, the officers drove to a filling station, where Michael Childress (Childress) arrived with blood on his person. He informed the officers that he had previously been flagged down by a man who asked him to telephone "911" because his girlfriend had jumped from his truck. Martin and Beaver immediately drove to the scene, where they saw Nicholson's vehicle in the middle of the roadway and Nicholson leaning over Polcyn's body. Nicholson repeated, "I can't believe she did this," and "I can't believe she jumped out." Polcyn was bleeding from the head and was unconscious but breathing. Martin then summoned an ambulance to take Polcyn to the hospital.

According to Martin's and Nicholson's subsequent testimony, after Nicholson and Polcyn began driving home from the scene of the traffic stop, Nicholson told Polcyn that he could not abide her leaving home again and that he was going to get custody of the two children and end his relationship with Polcyn. Polcyn then unbuckled her seat belt, opened the passenger door, and jumped out of the truck head first while the truck was traveling at a rate of thirty to forty miles per hour. Polcyn's testimony differs in that she adds that Nicholson hit her twice on her left cheek and that she hit him once. She remembers nothing else except awaking at the hospital. Specifically, she does not remember whether she jumped from, fell from, or was pushed from the truck. Finally, she testified that she has had a series of dreams about the incident and cannot definitively say whether her memories of the incident stem from actual events or from these dreams.

Polcyn subsequently filed this case, alleging causes of action for: (1) unreasonable search and seizure under the Fourth and Fourteenth Amendments by the officers at the scene; (2) denial of her due process rights under the Fourteenth Amendment to be free from bodily harm; (3) similar claims

---

want to go with Nicholson, that she was afraid of him, and that he had "beat me up." Despite this, she also testified that Nicholson was not angry a the scene and did not mistreat or mishandle Polcyn in the officers' presence.

against Sheriff Steve Loftis; (3) false arrest and (4) negligence under the South Carolina Tort Claims Act; and (5) assault and (6) battery against Nicholson.[3] Nicholson was later dismissed as a party-defendant.[4]

## III. STANDARD OF REVIEW

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Blair v. Defender Servs.*, 386 F.3d 623, 625 (4th Cir. 2004). To demonstrate that he is entitled to judgment as a matter of law, a party moving for summary judgment must first present evidence demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs.*, 945 F.2d 716, 718 (4th Cir. 1991). Once this requirement is satisfied, the burden shifts to the opposing party, who must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Blair*, 386 F.3d at 625 (quoting *White v. Rockingham Radiologists Ltd.*, 820 F.2d 98, 101 (4th Cir. 1987)). In meeting this burden, the party may not rest on allegations made in the pleadings. *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995). Finally, if the evidence is such that a reasonable jury could

---

[3] Polcyn's complaint does not specifically denominate a cause of action based on the Fourteenth Amendment's Due Process Clause. Both parties, however, address this cause of action in their memoranda on the motion for summary judgment. In addition, Polcyn pled facts sufficient to support this cause of action. Therefore, a cause of action for deprivation of due process rights is properly before the Court. *See Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 248 (4th Cir. 2005) ("[W]hen . . . a dismissal involves a civil rights complaint, we must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.") (internal punctuation omitted).

[4] Throughout this Order, the Court refers to all defendants except Nicholson collectively as "Defendants."

return a verdict for the non-moving party, summary judgment is inappropriate. *Blair*, 386 F.3d at 625.

## IV. DISCUSSION

### *A. Probable Cause*

The Fourth Amendment to the federal Constitution guarantees the right to be free from unreasonable search and seizure. U.S. Const. amend. IV. In practical terms, this means that police officers may not arrest an individual without probable cause to believe a crime has been committed. *See Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) ("If probable cause was lacking, then [a plaintiff] has successfully asserted the violation of . . . his Fourth Amendment right against unreasonable seizure.") An arrest is a seizure of the person, *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001), yet events not qualifying as a full custodial arrest can constitute a seizure. In these circumstances, a seizure will occur if a "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001). If a seizure occurs in either of these circumstances, an officer must have probable cause to believe a crime has been committed; if he lacks probable cause, the arrest will be unlawful (except in limited circumstances not relevant here). *Id.*; *see also Wilson*, 337 F.3d at 398.

Probable cause "is a 'practical, nontechnical conception' that addresses 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). It is a "fluid concept" that cannot be "reduced to a neat set of legal rules." *Id.* at 232.

In the instant case, Defendants undoubtedly had reasonable suspicion to stop and detain Gibson due to his violation of a state motor vehicle regulation; indeed, Defendants had probable cause to arrest Gibson for this violation. *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001). In addition, Polcyn concedes that Defendants had probable cause to arrest her once she had been removed from Gibson's vehicle. (Pl.'s Mem. Opp. Summ. J. 3.) Thus, Polcyn's assertion that she was seized without probable cause relates solely to Defendants' action in removing her from Gibson's vehicle. Furthermore, neither party suggests that Polcyn was engaged in criminal activity when Defendants removed her from the vehicle. Rather, both Polcyn and Defendants present the question as whether Polcyn's intoxication rendered her a danger to herself or others and, therefore, warranted Defendants' decision to detain her. Thus, Court analyzes the question of probable cause in this context.

*1. Qualified Immunity*

Defendants argue that they are entitled to qualified immunity on the issue of whether they had probable cause to detain Polcyn. To establish entitlement to qualified immunity, a government official performing a discretionary function must demonstrate that his "conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Bailey*, 349 F.3d at 739 (noting that burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official). When making a determination on the issue of qualified immunity, a court must (1) determine whether a constitutional right would have been violated on the facts alleged and (2) consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Brown v. Gilmore*, 278

F.3d 362, 367 (4th Cir. 2002). Further, to overcome qualified immunity, a court must find that the alleged facts demonstrate that "the established contours of probable cause were sufficiently clear at the time of the seizure such that the unlawfulness of the officers' actions would have been apparent to reasonable officers." *S.P. v. City of Takoma Park*, 134 F.3d 260, 266 (4th Cir. 1998). Here, the Court finds that Defendants are entitled to qualified immunity.[5]

*a. Violation of the Constitutional Right*

The Court of Appeals has, on three occasions, examined the issue of probable cause in the context presented by the facts of the present case. In *Gooden v. Howard County*, 954 F.2d 960, 968 (4th Cir. 1992) (en banc), the court held that probable cause to detain a person existed when an officer reasonably believed that the person posed a danger to himself or others. The court further held that the level of dangerousness required was not defined with sufficient particularity to overcome a defense of qualified immunity in *Gooden*. *Id.* at 967. Importantly, the court found that the officers in *Gooden* violated no clearly established right when they detained Gooden even in the absence of physical injuries, blood, bruises, or broken furniture. *Id.*

The court reached a similar conclusion in *S.P. v. City of Takoma Park*, 134 F.3d at 268. There, the court found that officers responding to an emergency call from a concerned third-party alerting them to a dangerous situation were justified in detaining the plaintiff for mental evaluation. *Id.* Moreover, the court reached this conclusion despite the fact that the plaintiff showed no signs of physical abuse, denied any psychiatric problems, and was uncooperative and evasive. *Id.* The

---

[5] Entitlement to qualified immunity is a question of law for the Court. *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005). Furthermore, where there are no disputed material facts relevant to the Court's qualified immunity inquiry, there is no question for the Court to submit to a jury and a ruling on qualified immunity is appropriate at the summary judgment stage. *Id.*

court concluded by finding that there was no clearly established authority which would have notified the officers that their conduct was unlawful. *Id.*

Finally, in *Bailey v. Kennedy*, 349 F.3d at 731, the court found probable cause to be lacking. In *Bailey*, officers seized an individual (Bailey) for mental evaluation after allegedly receiving a "911" report that Bailey was riding his bicycle while intoxicated. The report also indicated that Bailey may have been suicidal. When the officers arrived to investigate, however, they found him sitting at the dining room table eating lunch. After being questioned, Bailey "denied any thoughts of suicide, and there were no weapons or any other preparations for a suicide attempt evident." *Id.* at 739. When confronted by a second officer, he again denied any suicidal plans and referred to the report of his possible suicide attempt as "crazy." *Id.* at 739-40. The officers then seized Bailey and transported him to a hospital for a mental health evaluation.

The Court finds that the facts of the instant case align more closely with those in *Gooden* and *S.P.* than with those in *Bailey*.[6] Here, Defendants responded to an emergency call from Nicholson, who exhibited concern for Polcyn's safety. Further, Defendants possessed information which indicated that Polcyn was suffering from a bipolar disorder and had a drinking and, possibly, a drug

---

[6] The Court notes that *Gooden*, *S.P.,* and *Bailey* involve situations where the police detained an individual due to psychological problems, not intoxication. The Court, however, finds these cases applicable here for several reasons. First, the broad language of *Gooden* and *S.P.* implies that their reasoning can be imported to a scenario in which an individual is detained as a danger due to intoxication. *E.g., Gooden*, 134 F.3d at 266 (referring to an individual being involuntarily detained when a danger to himself or others but not specifying the condition creating the danger). Second, Defendants in this case were informed that Polcyn suffered from a psychological problem–namely a bipolar disorder–thus bringing the facts of this case into line with those in *Gooden* and *S.P.* In addition, *Bailey* involved a situation in which an individual allegedly had mental problems and was intoxicated, similar to Polcyn here. Finally, the Court is unaware of any case in this circuit specifying the level of probable cause necessary before a person can be detained as a danger due to intoxication. Therefore, the Court believes it proper to analogize the facts of this case to *Gooden*, *S.P.,* and *Bailey*.

problem. In contrast with *Bailey*, Defendants found Polcyn not in a place of safety, such as her home, but in a vehicle with a stranger who indicated that he had no desire to transport her any further and that he had just picked her up as she walked down the side of the road. Also, unlike Bailey, Polcyn did not deny that she suffered from a mental condition. In addition, Defendants had been informed that Polcyn had been intoxicated while walking down the side of a roadway. Based upon these facts, "[r]easonable officers, relying upon . . . *Gooden* [and *S.P.*] and the other circuit court decisions addressing similar situations, would have concluded that involuntarily detaining [Polcyn] was not only reasonable, but prudent." *Id.* at 267. In sum, given the facts known to Defendants and the totality of the circumstances, Defendants had information which would have led a reasonable officer to make a "practical, nontechnical" determination, *Gates*, 462 U.S. at 231, that Polcyn was a potential danger to herself or others. Therefore, Defendants did not violate Polcyn's Fourth Amendment rights.

*b. Clear Existence of the Right*

Polcyn attempts to overcome this conclusion by asserting that a question of fact exists as to whether Defendants had probable cause to remove her from Gibson's vehicle and to detain her. Even assuming, *arguendo*, that Polcyn's argument is correct, Defendants are nonetheless entitled to qualified immunity because the constitutional right they allegedly violated was not clearly defined in the law.

While the right to be free from unreasonable search and seizure is certainly established by caselaw, this right must be established in "more than just a general sense" before Defendants' immunity can be overcome. *Id.* at 266. Specifically, the court must find "that *the particular actions of these police officers* were unlawful under the law established at the time of the incident." *Id.*

(emphasis added). In other words, "To be clearly established for purposes of qualified immunity, '[t]he contour of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in original). Here, the Court finds that contours of the constitutional right claimed by Polcyn were not clearly established at the time the right was allegedly violated.

As in *Gooden* and *S.P.*, the level of dangerousness required before a person can be detained to protect himself or others remains imprecisely defined.[7] As the *S.P.* court noted, the definition of probable cause in this area remains imprecise. *Id.* ("We are aware of no cases that define 'dangerousness' with the requisite particularity or explain what type of evidence would be constitutionally sufficient to establish probable cause of a dangerous condition" (quoting *Gooden*, 954 F.2d at 967)). Although Defendants are charged with knowledge of *Gooden*, *S.P.*, and all other Supreme Court and Fourth Circuit rulings relating to probable cause, *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999), no subsequent decision has supplied the legal clarity which the *S.P.* court found lacking.[8]

---

[7] Although the qualified immunity analysis in *Gooden* and *S.P.* is not as rigid as here (because those decisions preceded *Saucier*), *S.P.*, at least, appears to hold that the defendants had probable cause to detain the plaintiff. 134 F.3d at 267 ("Reasonable officers, relying upon . . . *Gooden* and the other circuit court decisions addressing similar situations, would have concluded that involuntarily detaining [Polcyn] was not only reasonable, but prudent."). Neither case, however, added precision to the contours of probable cause in the context of detention to prevent harm to the detainee or others.

[8] Both parties cite to *Bailey*, 349 F.3d at 731, in support of their arguments on the clarity of the law in this area. *Bailey*, however, is irrelevant to the Court's analysis because it was decided after the events giving rise to Polcyn's suit occurred. *S.P.*, 134 F.3d at 266 (stating that conduct must be unlawful *under the law established at the time of the incident*) (emphasis added).

"Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Willingham*, 412 F.3d at 559 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Moreover, "[i]t protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Id.* (internal punctuation omitted). Even if Defendants were guilty of a bad guess when they detained Polcyn, the Court finds no evidence in the record that they crossed a bright line or knowingly violated the law. Indeed, given the unsettled state of the law in this area as evidenced by *Gooden* and *S.P.*, there was no bright line or clear law for Defendants to violate. Therefore, Defendants are entitled to immunity from Polcyn's § 1983 claim for unreasonable seizure.

*B. Substantive Due Process*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Polcyn contends that Defendants deprived her of her liberty interest in freedom from violence against her person. In making this claim, however, Polcyn recognizes that, in general, "a state's failure to protect an individual against private violence simply does not constitute a violation of the due process clause." (Pl.'s Mem. Opp. Summ. J. 4.) (quoting *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 197 (1989)). Polcyn nevertheless argues that her claim fits within one of the exceptions to this general rule.

While *DeShaney* established the rule that a state cannot be held liable under the Due Process Clause for failure to protect an individual from private acts of violence, both the Supreme Court and the Court of Appeals have recognized that exceptions to *DeShaney* exist. In the context of the instant case, two exceptions arguably apply. First, if the state has a special relationship with an

individual, the state has an affirmative duty to protect the individual from harm inflicted by third parties. *Id.* at 200; *Pinder v. Johnson*, 54 F.3d 1169, 1174-75 (4th Cir. 1995) (en banc). Second, a state's duty to protect an individual from third parties arises when the state itself has created the danger to which the individual is exposed. *Deshaney*, 489 U.S. at 201. The Court will analyze each of these exceptions in turn.

*1. Special Relationship Exception*

The "special relationship" exception recognized by DeShaney had its origins in a state's obligation to protect inmates confined within its penal institutions*, id.* at 198-200; *Estelle v. Gamble*, 429 U.S. 97 (1976), and was subsequently extended to apply to persons held within mental institutions, *DeShaney,* 489 U.S. at 199; *Youngberg v. Romeo*, 457 U.S. 307 (1982). As the *DeShaney* Court recognized, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some general responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199-200. In post-*DeShaney* cases, courts have limited the applicability of this exception to situations in which the relationship between state and individual is based on "incarceration, institutionalization, or the like." *Pinder*, 54 F.3d at 1175. As the Court of Appeals has noted, "This Court has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise under the Due Process Clause." *Id.*

Although tethered to the concept of custody, the special relationship exception does not appear to require full custodial arrest or institutionalization before it is triggered. *DeShaney* itself recognized that the exception arises "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his

freedom to act on his own behalf." 489 U.S. at 200. The Court of Appeals, in *Pinder*, likewise noted that the exception applies where there is "some sort of confinement of the injured party[.]" 54 F.3d at 1175; *see also id.* (finding the exception arises when individuals are "affirmatively restrained" or "otherwise restricted"). Based on this reasoning, once the state has restrained an individual and restricted his ability to act on his own behalf, an affirmative duty to protect him from violent acts of third parties arises.

*a. Qualified Immunity*

*i. Violation of a Constitutional Right*

In the instant case, there are facts on which a reasonable fact finder could determine that Polcyn was in the custody of–or at least had been restrained by–Defendants, beginning at the time when she was removed from Gibson's vehicle. Polcyn was clearly not free to leave the scene, as evidenced by the fact that Defendants refused her permission to leave and offered her the choice of either being taken to jail or riding home with Nicholson. Therefore, when viewing the facts in a light most favorable to Polcyn, this seizure triggered Defendants' affirmative duty to protect Polcyn from violence by Nicholson.

Facts likewise exist from which a fact finder could infer that Defendants breached this duty owed to Polcyn. Evidence in the record establishes, at the very least, that Defendants were aware of a prior history of domestic violence between Polcyn and Nicholson. They also were aware of Polcyn's potentially dangerous mental state. This, when combined with her obvious intoxication and possible drug use, resulted in a clear possibility of potential harm should Polcyn and Nicholson be immediately reunited.

*ii. Clear Existence of the Right*

Despite the fact that Polcyn has established the existence of a genuine issue of material fact as to whether her due process rights were violated, she will not survive summary judgment if those rights were not clearly recognized at the time the alleged violation occurred. *Saucier*, 533 U.S. at 200. The Court finds that the rights claimed by Polcyn were not clearly established, thus Defendants are entitled to the protections of qualified immunity from Polcyn's claims under the special relationship exception.

As the Court of Appeals noted in 1995, "[A]lthough *DeShaney* held that state actors must assume some responsibility for [the] safety and general well-being of those in custody, neither *DeShaney* nor subsequent caselaw has clearly established the extent of that responsibility." *Hamrick v. Packard*, 57 F.3d 1066 (4th Cir. 1995) (table). Polcyn cites only one subsequent case, *Pullium v. Ceresini*, 221 F.Supp.2d 600 (D.Md. 2002), purporting to establish a clear rule delineating the level of responsibility the state exercises over those in its custody in these situations.

In *Pullium*, the plaintiff arrived home at 3:00 p.m. to find her husband there, unconscious as a result of alcohol and/or drug abuse. The plaintiff left, but when she returned home at 11:00 p.m. she found her husband intoxicated and sitting on the curb outside. When her husband demanded that the plaintiff drive him to his girlfriend's home, she complied. While en route, her husband physically and verbally assaulted the plaintiff, who subsequently left him at his girlfriend's home. Later in the evening, after many calls and complaints, the police were summoned to the girlfriend's home, where they apparently retrieved Mr. Pullium and drove him to the plaintiff's house. There, despite pleas of protest from the plaintiff accompanied by expressions of her fear of violence at the

hands of her visibly intoxicated and violent husband, they forced her to admit him and drove away. Ten minutes later, the plaintiff was assaulted by her husband.

The Court finds *Pullium* distinguishable for several reasons. First, *Pullium* is a decision from a Maryland district court and, as such, is not binding on Defendants. The court in *Pullium* itself recognized that it was "aware that no decision of the Supreme Court or the Fourth Circuit has found § 1983 liability under facts similar to those presented here." *Id.* at 605 n.5. This fact, in and of itself, weighs heavily in favor of the conclusion that the right claimed by Polcyn is not clearly established by governing law. *See Edwards*, 178 F.3d at 251 (holding that courts in this circuit ordinarily need not look beyond decisions of the Supreme Court, the court of appeals, or the state's highest court in determining whether a right was clearly established).

Second, *Pullium* concluded that the conduct at issue was so egregious that its unlawfulness can be implied from the Constitution itself despite the absence of decisional authority supporting such an implication. 221 F.Supp.2d at 605 n.5. The facts in the instant case, however, do not rise to this level of egregiousness. Here, in contrast with *Pullium*, Polcyn makes no allegation that Nicholson had assaulted her shortly before Defendants committed her to his care. Further, there is no indication that Nicholson was violent, intoxicated, or angry when he arrived at the scene where Polcyn was being detained. Finally, decisions of the Court of Appeals indicate that courts should be hesitant to impose liability in the absence of a right clearly established in caselaw even when the conduct of the state is egregious or offensive. *E.g., Robles v. Prince George's County, Maryland*, 302 F.3d 262, 270-71 (4th Cir. 2002) (finding that the unlawfulness of officers tying a pretrial detainee to a post and abandoning him there was not clearly established in the absence of caselaw); *see also Robles v. Prince George's County, Maryland*, 308 F.3d 437, 438 (4th Cir. 2002)

(Wilkinson, J., concurring in denial of rehearing en banc) ("To equate knowledge of wrongfulness in a generic sense with knowledge of unconstitutionality in a specific sense is not consistent with the rule of law."). Based on these facts, the Court is unable to find, by implication, that a "general constitutional rule already identified in the decisional law" applies "with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Pullium*, 221 F.Supp.2d at 605 n.5 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)) (internal punctuation omitted).

In sum, no relevant decision has changed the state of the law since *Hamrick* was handed down. Given the lack of precision in this area, Defendants did not knowingly violate any right "clearly established [by the] law," *Meeker v. Edmundson*, 415 F.3d 317, 322 (4th Cir. 2005), or cross any bright line established by prior decisions, *Willingham*, 412 F.3d at 559. Even if Defendants made "a bad guess" in committing Polcyn to Nicholson's care, their guess is immunized from liability. *Id.* Thus, Polcyn's special relationship claim must fail.

*2. State Created Danger Exception*

The Supreme Court and Court of Appeals have recognized that a state can be liable for the harmful acts of private parties when the state itself creates the danger. *DeShaney*, 489 U.S. at 201; *Pinder*, 54 F.3d at 1175. To create the danger, the state must take affirmative steps which either cause or enhance the danger faced by an individual. *Id.*

*a. Qualified Immunity*

*i. Violation of a Constitutional Right*

As with the special relationship exception, there are facts from which a reasonable fact finder could determine that Defendants, by their own affirmative acts, created or enhanced the danger faced

by Polcyn. Defendants knew of Polcyn's history of bipolar disorder, her intoxicated state, and the possibility that she was under the influence of drugs. They also were aware of a prior history of domestic violence between Polcyn and Nicholson, and they heard Polcyn state that she was afraid that Nicholson would beat her. Defendants called Nicholson to the scene of Polcyn's detention, allowed Gibson to leave the scene, and–on Polcyn's view of the facts–forced Polcyn to leave with Nicholson when neither Polcyn or Nicholson desired this. These actions create, at the least, a question of fact as to whether Defendants acted affirmatively in placing Polcyn in danger. Thus, Polcyn has presented facts which establish, for purposes of a motion for summary judgment, that Defendants violated her due process rights by creating or, at least, enhancing a danger to which she was exposed.

*ii. Clear Existence of the Right*

Having determined that Polcyn has alleged facts which establish that a constitutional right was violated, the Court once again turns to whether that right was clearly established at the time of its alleged violation. *Saucier*, 533 U.S. at 200.

The Supreme Court and the Court of Appeals have given little definition to the state created danger exception. In *DeShaney*, the Court did little more than imply that the exception existed. 489 U.S. at 201 ("While the State may have been aware of the dangers that [the plaintiff] faced, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."). Similarly, the *Pinder* court recognized that a state could be held liable where it created or enhanced a danger, but the court gave no guidance as to what steps a state had to take to render itself liable. In fact, *Pinder* characterized this area of law as undefined and imprecise:

> At some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused, but no such point is reached here. It cannot be that the state "commits an affirmative act" or "creates a danger" every time it does anything that makes injury at the hands of a third party more likely.

54 F.3d at 1175. As the courts have not further clarified the "point on the spectrum" where a state's passive conduct blossoms into affirmative misconduct, the law remains as unclear as it was when *Pinder* was handed down.[9] Given the clarity with which the law must speak before qualified immunity can be overcome, *Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Willingham*, 412 F.3d at 558, Defendants simply cannot be held liable for their transgressions when the law retains its "gray areas." *Id.*

As Defendants are entitled to immunity from Polcyn's § 1983 claims, the Court finds that their motion for summary judgment should be granted as to these claims. *See id.* at 559 ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

*C. State Law Claims*

As the Court will grant Defendants' motion for summary judgment on Polcyn's § 1983 claims, only her claims arising under state law remain. Title 28 U.S.C. § 1367(c) vests the Court with discretion to decline to exercise jurisdiction over these claims if the court "has dismissed all claims over which it has original jurisdiction." In addition, a Court is permitted to dismiss the remaining state claims where they raise novel or complex issues of state law. *Id.* Here, Polcyn's state claims involve, in part, complex issues of state law, specifically the application of South

---

[9] In support of her argument that Defendants are not entitled to qualified immunity, Polcyn again relies on *Pullium*. For the reasons stated above, the Court finds *Pullium* distinguishable from the present case.

Carolina's Tort Claims Act. Because the Court has disposed of Polcyn's claims over which it had original jurisdiction and because of the complexity of one of Polcyn's remaining state claims, the Court finds that it should dismiss these claims under § 1367(c).

## V. CONCLUSION

Based on the foregoing, the Court finds that Defendants are entitled to summary judgment on Polcyn's § 1983 claims. The Court further finds that it should dismiss Polcyn's claims arising under state law. Therefore, it is the judgment of the Court that Defendants' motion for summary judgment is **GRANTED IN PART** and that the remaining claims are **DISMISSED**.

**IT IS SO ORDERED.**

Signed this 17th day of October, 2005, in Spartanburg, South Carolina.

s/ Henry F. Floyd
HENRY F. FLOYD
UNITED STATES DISTRICT JUDGE